UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATRICIA DZURKA,

        Plaintiff,                      Case No. 16-cv-11718

vs.                                         HON. MARK A. GOLDSMITH

MIDMICHIGAN MEDICAL
CENTER-MIDLAND,

        Defendant.
_____/

**OPINION & ORDER
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 19) AS TO
PLAINTIFF'S FMLA CLAIM AND DECLINING TO EXERCISE JURISDICTION
OVER PLAINTIFF'S PENDENT STATE LAW CLAIM**

This matter is before the Court on Defendant MidMichigan Medical Center-Midland's motion for summary judgment (Dkt. 19). The issues have been fully briefed and a hearing was held on September 20, 2017. For the reasons stated below, the Court grants MidMichigan's motion as to Plaintiff Patricia Dzurka's claim brought pursuant to the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq., and declines to exercise jurisdiction over Dzurka's pendent state law claim.

## I. BACKGROUND

Dzurka was hired by MidMichigan as a first assistant surgical technician on November 2, 2007. Dzurka Dep., Ex. 1 to Pl. Resp., at 13 (Dkt. 22-2). While Dzurka received some discipline during her first few years at MidMichigan, it was not until 2015 that she began receiving the discipline that ultimately resulted in her termination. In August of that year, Dzurka met with Melissa Chambers, her immediate supervisor, and Ruth Kitzmiller, the director of Dzurka's department. While discussing Dzurka's performance, Kitzmiller informed Dzurka that her score

1

was lowered due to a variance report that was filed against her. Id. A variance report is an anonymous submission against an employee who has failed to follow the medical center's protocol. Schmitt Aff., Ex. 1 to Def. Mot., ¶ 11 (Dkt. 19-2). Kitzmiller declined to provide Dzurka with a copy of the variance report, but later forwarded an email describing the incident in enough detail to allow Dzurka to piece together the identity of the complainant, Ashley Byron, a room nurse at the medical center. 8/18/2015 Email, Ex. 20 to Pl. Resp., at 1 (cm/ecf page) (Dkt. 22-21).

On August 20, 2015, after she learned that Byron had filed the variance report, Dzurka approached Byron to discuss the issue. When Dzurka asked Byron if she was involved in the filing of the variance report, Byron responded that she did not write the report. Dzurka Dep. at 64. Dzurka then responded that she did not ask who wrote the report, but was curious as to whether Byron agreed with its contents. Id. at 65. Byron repeated that she was not the author of the report. Id. Dzurka then told Byron that "if there's a problem between us next time maybe we should just talk about it ourselves before you run to [Chambers] and make a big deal about it." Id.

What followed next is disputed by the parties. Chambers testified that Byron came into her office upset the following day, at which point Chambers called Kitzmiller and Matt Kelsey, Dzurka's direct supervisor, into her office. Chambers Dep., Ex. 8 to Pl. Resp., at 20 (Dkt. 22-9). According to Chambers, Byron stated that Dzurka had "haggled and attacked" her the previous day regarding the variance report. Id. Kitzmiller stated that Byron, who Kitzmiller described as visibly upset and shaking, informed her that Dzurka had cornered her in the locker room of the medical center and that she wanted to report the incident to human resources. Kitzmiller Dep., Ex. 9 to Pl. Resp., at 21 (Dkt. 22-10). Byron was then directed to speak with Tara Schmitt, a strategic partner in the medical center's human resources department. Schmitt Aff. ¶ 10. Byron told

Schmitt about the incident and told her that she was afraid to submit future variance reports because of possible retaliation. Id. ¶¶ 10, 12.

Dzurka disputes this characterization of events, pointing to emails between Schmitt, Kitzmiller, and Chambers in which they discuss the variance report and whether Dzurka's response to it constituted a violation of company policy. Dzurka points to an email sent by Schmitt in which she asks if Dzurka, in addition to speaking with Byron, "approached the other employee who was involved in the variance? Can someone casually ask her if she was approached." 8/24/2015 Emails, Ex. 21 to Pl. Resp., at 1 (cm/ecf page) (Dkt. 22-22).

After conducting an investigation into the incident, including an interview with Dzurka, Schmitt determined that Dzurka had violated MidMichigan's corrective action and disciplinary procedure and rules of conduct policy by engaging in coercive treatment against a coworker. Schmitt Aff. ¶¶ 17-19. Under MidMichigan's policy, an employee can be issued anywhere from one to four "action steps" depending on the severity of the violation, with a fourth action step resulting in termination. Dzurka received three action steps for the incident with Byron, which resulted in a suspension. Id. ¶ 21. Schmitt determined that this discipline was warranted in light of MidMichigan's policy prohibiting retaliation against those who make good-faith internal complaints. Id. ¶ 20.

In November 2015, Dzurka received a final action step for accumulating too many absences and late arrivals. MidMichigan's policy states that an action step is warranted where an employee receives eight attendance "points" (assessed for absences and late arrivals) over the course of a twelve month period. Id. ¶ 26. Prior to November 1, 2015, Dzurka had received 4.5 points. Id. ¶ 31. From November 3, 2015 through November 6, 2015, Dzurka missed work in order to participate in a medical mission overseas, believing she had enough paid time off ("PTO")

to cover these absences. Dzurka Dep. at 164. While Dzurka was out of the office, Kelsey and Kitzmiller discovered that she did not have enough PTO to cover her time away from work. Kitzmiller Dep. at 41. Kelsey and Kitzmiller reported this to Schmitt, who determined that an action step was appropriate. Schmitt Aff. ¶ 29-32. Because this was Dzurka's fourth action step, her employment with MidMichigan was terminated. Id. ¶ 33.

After Dzurka was informed of her termination, Kitzmiller and Schmitt accompanied her to the company locker room to gather her belongings. Dzurka Dep. at 77. Dzurka testified that while she was gathering her things, she felt that she was being rushed by Schmitt and Dzurka. Id. As she was finishing, Dzurka remarked to Kitzmiller and Schmitt that she was "almost done planting the bomb." Id.; Kitzmiller Dep. at 50-51; Schmitt Aff. ¶ 37. Upon hearing this remark, Kitzmiller and Schmitt had Dzurka escorted off the premises and contacted police. Id. ¶ 41. Schmitt also issued Dzurka another corrective action, which stated that while Dzurka was terminated for her retaliation and attendance, her bomb threat was independently sufficient to warrant termination. Id. ¶ 43.

Dzurka contends that this discipline was issued in retaliation for voicing various concerns regarding MidMichigan's policies. Her primary concern, which she contends motivated her termination, was that MidMichigan was not properly staffing its laser procedures. She noted that in normal procedures, there were four individuals present: (i) a surgeon; (ii) a surgical technician; (iii) an anesthesiologist or nurse anesthetist; and (iv) a circulating nurse. Dzurka Dep. at 84-86. During laser procedures, MidMichigan would have the circulating nurse operate the laser, leaving the operating room without an individual to perform the typical duties of a circulating nurse. Id. at 84-85. Dzurka believed that MidMichigan's practice of having three staff members present in the room while the laser was being operated was insufficient, and that best practices required a

fourth employee to be present to ensure patient safety. While she could not point to an instance where a patient was harmed by the failure to include a fourth staff member, she did list one example in which a patient who was undergoing a kidney stone procedure nearly suffered injury as a result of MidMichigan's policy. Id. at 85-86.

Dzurka testified that she first brought this issue to management's attention in either 2013 or 2014 during one of her evaluations. Id. at 90. Dzurka testified that she also brought the issue to Chambers's and Kitzmiller's attention during the last year of her employment. Id. at 92. When Chambers and Kitzmiller did not address her concern, Dzurka went directly to the president of MidMichigan, Diane Postler-Slattery. Id. at 119. On June 17, 2015, Dzurka met with Postler-Slattery to discuss how the company's laser program was being run. Id. at 119-120. Dzurka expressed her belief that MidMichigan's failure to properly staff laser procedures put patients at risk of injury and violated the relevant standards of care. Id. at 121-122. The following day, Postler-Slattery emailed Dzurka to inform her that she met with Kitzmiller and Chambers and instructed them to respond to Dzurka's concerns regarding the laser program. 6/18/2015 Emails, Ex. 13 to Pl. Resp. at 1 (cm/ecf page) (Dkt. 22-14). She told Dzurka to contact her if she did not hear anything within two weeks. Id.

Dzurka also contacted the Occupational Safety and Health Association ("OSHA") in the summer of 2015 to inquire regarding whether there were guidelines for laser use. Dzurka Dep. at 101. The record indicates that Chambers, Kitzmiller, and Postler-Slattery were made aware of Dzurka's contact with OSHA. 6/5/2017 Emails, Ex. 10 to Pl. Resp., at 1 (cm/ecf page) (Dkt. 22-11); 6/4/2017 Emails, Ex. 11 to Pl. Resp., at 1 (cm/ecf page) (Dkt. 22-12); Postler-Slattery notes, Ex. 12 to Pl. Resp., at 2 (cm/ecf page) (Dkt. 22-13). In response to Dzurka's concern, MidMichigan appointed an employee to oversee the laser program in July 2015. Dzurka Dep. at

94. In Dzurka's words, "the real reason I think that I got fired is because . . . I brought them a patient safety concern which I felt very strong about, my management wouldn't do anything. I went over their head and they didn't like it." Id. at 114.

Dzurka also contends that her termination was motivated by her use of leave pursuant to the Family Medical Leave Act. On April 27, 2015, Dzurka completed a request for intermittent medical leave to care for her mother. When Kitzmiller was informed of Dzurka's FMLA leave, she responded 'Fmla for what????" 4/27/2015 Emails, Ex. 6 to Pl. Resp. at 1 (cm/ecf page) (Dkt. 22-7). The record indicates that Dzurka took intermittent FMLA leave at various points throughout her time with MidMichigan. Dzurka Dep. at 157-164.

## II. STANDARD OF REVIEW

A court must grant "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In making this determination, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." U.S. S.E.C. v. Sierra Brokerage Servs., Inc., 712 F.3d 321, 327 (6th Cir. 2013). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986). "[W]hen a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" Id. at 250 (quoting Fed. R. Civ. P. 56(e)). Furthermore, plaintiff "cannot rely on conjecture or conclusory accusations." Arendale v. City of Memphis, 519 F.3d 587, 605 (6th Cir. 2008).

## III. ANALYSIS[1]

---

[1] Without a federal claim remaining, the Court dismisses the state law claim without prejudice, thereby obviating the need to address the limitations issue regarding that claim.

MidMichigan argues that both Dzurka's FMLA and state law public policy claims are barred by a six-month period of limitations set forth in her employment agreement. Because Dzurka's FMLA claim can be dismissed on the merits, the Court declines to address whether the agreement is enforceable and, if so, whether such an agreement can be applied to shorten the time to bring a FMLA claim.

The FMLA states that an employer may not "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [FMLA]." 29 U.S.C. § 2615(a)(2); 29 C.F.R § 825.220. Where, as here, the plaintiff is relying on circumstantial evidence, an FMLA retaliation claim is analyzed under the familiar three-part, burden-shifting test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Bryson v. Regis Corp., 498 F.3d 561, 570 (6th Cir. 2007). Under this test, the plaintiff must first demonstrate a prima facie case of FMLA retaliation by establishing the following four factors: (i) the plaintiff engaged in conduct protected by the act, (ii) the defendant was aware that the plaintiff exercised protected rights, (iii) the defendant took an adverse employment action against the plaintiff, and (iv) there was a causal connection between the protected conduct and the adverse employment action. Saroli v. Automation & Modular Components, Inc., 405 F.3d 446, 451 (6th Cir. 2005).

If the plaintiff is able to make out a prima facie case of FMLA retaliation, "the burden shifts to the employer to proffer a legitimate, nondiscriminatory rationale" for the adverse action. Edgar v. JAC Products, Inc., 443 F.3d 501, 508 (6th Cir. 2006). If the employer can meet this burden, the burden shifts back to the plaintiff to prove that "the alleged nondiscriminatory rationale was in reality a pretext designed to mask discrimination." Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 315 (6th Cir. 2001). The plaintiff can prove pretext by demonstrating that "the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged

conduct, or (3) was insufficient to warrant the challenged conduct." Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000).

Dzurka argues that she was wrongly assessed the action steps that led to her firing, and that retaliation can be inferred from the temporal proximity between her use of FMLA leave and her termination. Dzurka was approved for intermittent FMLA leave from April 17, 2015 through October 17, 2015 in order to take care of her mother. 4/27/2015 Emails, Ex. 5 to Pl. Resp. at 1 (cm/ecf page) (Dkt. 22-6). She was issued her fourth action step, which resulted in her termination, on November 10, 2015. Discharge Form, Ex. 33 to Pl. Resp., at 1 (cm/ecf page) (Dkt. 22-34). MidMichigan does not contest that Dzurka engaged in protected activity, that it was aware of this activity, or that Dzurka suffered an adverse employment action. It argues that temporal proximity alone is insufficient to prove causation.

"This '[c]ircuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise.'" Bush v. Compass Grp. USA, Inc., 683 F. App'x 440, 451 (6th Cir. 2017) (quoting DiCarlo v. Potter, 358 F.3d 408, 421 (6th Cir. 2004)). However, "the relevant timeframe for us to consider in determining whether there was a causal connection between the plaintiff's FMLA leave and the adverse employment action is the 'time after an employer learns of a protected activity,' not the time after the plaintiff's FMLA leave expires." Id. at 452 (quoting Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008)).

Emails in the record indicate that Kitzmiller was made aware of the protected activity on April 27, 2015, over six months prior to Dzurka's termination. "The 'more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must

supplement his claim with other evidence of retaliatory conduct to establish causality.'" Id. (quoting Vereecke v. Huron Valley Sch. Dist., 609 F.3d 392, 400 (6th. Cir. 2010)). The only other evidence of retaliatory conduct that Dzurka proffers is Kitzmiller's reaction to learning of Dzurka's FMLA leave. Upon receiving an email that Dzurka would be taking FMLA leave, Kitzmiller responded, "Fmla for what????" 4/27/2015 Emails at 1 (cm/ecf page).

This email, standing alone, is not sufficient to demonstrate causation. The record indicates that Dzurka had been taking FMLA leave for years prior to the email with no repercussions. See Dzurka Dep. at 157-164. Further, Dzurka stated her belief that her termination was not motivated by her use of FMLA leave. She testified that "the real reason I think that I got fired is because again I brought to them a patient safety concern which I felt very strong about, my management wouldn't do anything, I went over their head and they didn't like it." Id. at 114; see also Bush, 684 F. App'x at 452 (holding that fatal flaw to FMLA claim was uncontested evidence that the plaintiff was discharged due to a poor working relationship with a client, not because of FMLA leave). Given the lack of temporal proximity between when MidMichigan learned of the protected activity and when Dzurka was terminated, and the lack of other evidence of retaliatory conduct, Dzurka's FMLA claim is dismissed for failure to establish causation.

In light of this dismissal, the Court declines to exercise jurisdiction over Dzurka's state law public policy claim. The Supreme Court has held that "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity . . . to decide whether to exercise jurisdiction over a case . . . involving pendent state-law claims." Carnegie-Mellon University v. Cohill, 484 US 343, 350 (1988). "Only overwhelming interests in judicial economy may allow a district court to properly exercise its discretion and decide a pendent state claim even if the federal claim has been dismissed before

9

trial." Musson Theatrical, Inc. v. Fed. Exp. Corp., 89 F.3d 1244, 1254 (6th Cir. 1996) (citation and quotation marks omitted). There is no overwhelming interest in judicial economy in the present case. Because Dzurka's federal claim no longer remains, the Court declines to exercise jurisdiction over her pendent state law claim.

## IV. CONCLUSION

For the foregoing reasons, the Court grants MidMichigan's motion for summary judgment (Dkt. 19) as to Dzurka's FMLA claim and declines to exercise jurisdiction over her pendent state law claim.

SO ORDERED.

Dated: October 30, 2017  s/Mark A. Goldsmith
Detroit, Michigan  MARK A. GOLDSMITH
 United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 30, 2017.

 s/Karri Sandusky
 Case Manager